Albert J. STIFTEL, Andrew D. Christie, George R. Wright, Robert C. O'Hara, Vincent A. Bifferato, Clarence W. Taylor, Joseph T. Walsh, Claud L. Tease, William G. Bush, III, Bernard Balick and Joseph J. Longobardi, Plaintiffs below, Appellants,

v.

John E. MALARKEY, Donald Dryden, the State of Delaware and Mary Jornlin, Defendants below, Appellees.

Supreme Court of Delaware.

Submitted Nov. 14, 1977.

Decided Dec. 28, 1977.

Victor F. Battaglia of Biggs & Battaglia, Wilmington, for plaintiffs-appellants.

Regina M. Small, Deputy Atty. Gen., Wilmington, for defendants-appellees.

Before TUNNELL, QUILLEN and STOREY, Justices *Ad Litem*.\*

TUNNELL, Justice *Ad Litem*, for the majority:

This is an appeal from a judgment of the Court of Chancery,[1] denying plaintiffs, who are all our Superior Court judges, the injunctive and monetary relief they seek against the State. Plaintiffs claim that since June 30, 1975, under the provisions of Senate Bill No. 395, as amended by Senate Amendment No. 3 (amending 29 *Del.C.* by adding a new § 6532, hereinafter called the "C.O.L.A." law), they have been' and are entitled to certain cost of living upward adjustments to their salaries, corresponding with the percentage increases in the cost of living index maintained by the federal government for the Philadelphia region.

The operative provision of subsection (a) of that new section is in these words:

"All employees of the State shall be paid a salary supplement. . . ."

The threshold question, then, is whether plaintiffs are "employees" within the meaning of that statute. Subsection (c) of that same section, worded as it then was, defined the word "employee," for the purposes of that section, thus:

"(c) For purposes of this section, an 'employee' is defined as one who works the regularly scheduled full-time hours of the employing agency or at least 30 or more hours per week or 130 hours per month

---

\* Appointed by the governor under the provisions of Art. IV, § 15, of the Constitution, after the Chief Justice and the associate justices who are regularly in office, because of self-interest, declared disqualifications.

1. The Vice-Chancellor declined to disqualify himself, as his opinion states, in order to provide plaintiffs a trial court forum. It should be noted, however, that his decision was against his self-interest. His opinion below is reported at 378 A.2d 133 (1977).

(with allowable interruptions) throughout the year and is compensated with a regular State pay check."

Plaintiffs, through their counsel, urge that this statutory definition includes them. A stipulation filed with the Register establishes that plaintiffs satisfy the stated work minimums, are paid by regular state pay checks and are not getting the supplements to which application of the formula would appear to entitle them. The State, however, through the Attorney General's office, contends that judges are excluded from these benefits because they are "public officers," not "employees." While one cannot be certain, in the absence of litigation, whether some persons are or are not "officers", the parties agree that plaintiffs are officers. Having considered the matter, we are compelled to conclude that while it is true that not all the State's employees are officers, yet, for the purposes of Section 1 of this statute at least, all its officers, including plaintiffs, are employees.

■ A statute can define its terms as the lawmakers see fit in order to make clear what is intended. *Fox v. Standard Oil Company of New Jersey*, 294 U.S. 87, 55 S.Ct. 333, 79 L.Ed. 780 (1935); *Mt. Pleasant Cab Company v. Rhode Island Unemployment Compensation Board*, 73 R.I. 7, 53 A.2d 485 (1947); *Cedar Rapids Community School District v. Parr*, 227 N.W.2d 486 (Iowa 1975); *IBM v. Brown*, 167 Conn. 123, 355 A.2d 236 (1974); and 1A Sutherland, *Statutory Construction* (4th Ed.), § 20.08, at 59 and § 27.02, at 310. This is no more than a basic principle of draftsmanship applicable to any form of writing.

Unlike the several cases cited by the State, in which the statute contained no definition at all, or where the meaning was delineated merely by saying that a certain word of broad meaning shall be read to "include" specific groups or concepts within its parameters, the statute here reviewed undertakes to "define" who is referred to as an "employee." The State urges that from general language usage, which it contends is clear and uniform, we should recognize that officers are a group distinct from employees, so that the statutory definition is meant, not to define, but merely to limit the scope of, the word "employee." Thus, the State, in effect, would supplement the statutory definition and emasculate the meaning of the word "defined" by asking us to read the statute as if these underlined words had been injected into it:

". . . an employee is defined as one who, *being an employee*, works . . .."

If we were to accept the State's interpretation of this definition, we should be forced to the conclusion that, notwithstanding the General Assembly's statement that it was *defining* "employee," it used circular language and in fact failed to define it at all. The statute seems to us to be clear, leaving no room for judicial interpretation.

In deference to those who press the contrary view, however, we now also examine those indicia which might be relevant if the legislation were ambiguous.

First, we look at the legislative history, to see whether the legislators were advised that "employees" did not or could not include officers. There we see that Secretary of Finance Malarkey, the draftsman of the Bill, drew it at the direction of the Governor's Task Force, which he chaired. After it was introduced in the General Assembly, he explained the bill and answered questions on the floor of each house about its meaning and effect, being the only person to do so. Nowhere does it appear that it was ever suggested that public officers were not included. Indeed, the opposite appears.

In the lower house, Mr. Malarkey was questioned by the members. He was asked, for example, what the total annual cost of the C.O.L.A. bill would be if the cost of living index were to rise 10% within one year, and he answered. There was much discussion of the prospective costs. Mr. Dryden, the State's Budget Director at the time, testified at the trial below that he is the person who made, or supervised the making of, the calculations which were passed on to the Governor's Task Force and then to the General Assembly, estimating

these costs, and that adjustments to all of the salaries of all the State's officers,[2] including the judiciary, were included in those calculations.

Representative Riddings had this exchange with the Secretary:

"Q. Riddings: I see. Is there any group that, in particular, that are excluded in this?

"A. The legislators, sir. [Laughter]

.    .    .    .    .

"A. . . . and in answer to a previous question, sir, the State Police are covered by the cost-of-living portion of the bill.

.    .    .    .    .

"Q. Riddings: Would you direct my attention to what section of this bill is this covered under, I could not establish. . .

.    .    .    .    .

"A. It's § 1 sir. I don't have a copy of the bill but I'm sure it's § 1, sir. Section 1 effects (sic) every State employee who is defined as one who works the regular scheduled full-time hours; an employee who works there at least 30 or more hours per week or 130 hours per month."

In the Senate the questioning of Mr. Malarkey was very extensive. Among the more pertinent passages are these exchanges with Senators Manning and Berndt:

"Question: Manning: Mr. President. You say all employees of the State of Delaware. I hope that this does not apply to the General Assembly or does it?

"Answer: One second please, Senator. An employee definition is here, Senator, I think probably leaves you all out. Works the regularly scheduled full-time hours of the employing agency or at least 30 or more hours per week or 130 hours per month with allowable exemptions . . compensated with a regular pay check. I'm not sure how many hours you put in Senator."

   *    *    *    *    *    *

"Question: Berndt: This does nothing for secretaries and division heads and agency heads then?

"Answer: The only thing it allows, Senator two things. One they will get whatever increases in the '76 budget, if there was (sic) one granted. And two, they will get the cost-of-living supplement if there was (sic) one which starts April 1st sir."

In light of the stipulation mentioned above and this and other discussions, showing that division heads and cabinet secretaries—including Mr. Malarkey himself—were said to be within the coverage of the bill, and that legislators are excluded only by reason of the work requirements in the definition, there is no basis for a conclusion that the General Assembly intended to exclude any appointed officials who come within its definition. Even to attempt such an exercise in mind reading would accord less respect to the General Assembly than is its due.

Another indication of the meaning of "employees" appears in this very statute, though not in the section to which the statutory definition applies:

"Section 2(c) The pay plan for employees of the Judicial Branch *other than the State Judiciary* shall be increased by 8%." (Italics added).

And in 50 Del.L., c. 51, § 6, dealing with the Family Court, this language appears:

"*Judges and all other employees of the Court* are employees of the State . . ." (Italics added).

At oral argument, counsel could think of no distinction pertinent to the status of employees and officers which would set judges of the Family Court apart from judges of the Superior Court. Nor can we in that sense. If the judges of the Family Court are employees, it would appear that plaintiffs are equally so. See also the following Delaware statutes, in which the matter is variously dealt with: 29 *Del.C.*

---

2. Certain computer people, who may or may not be public officers, were omitted, but the effect of that omission is insignificant and immaterial.

§ 6340(a), implicitly including public officers within "employees," for otherwise the Budget Director could not make up a complete State budget; 29 *Del.C.*, Chapter 55, by definition including within the employee class all public officers other than judges, who were already covered by Chap. 56; 29 *Del.C.* § 5853, by definition including certain designated officers and excluding others from the scope of "employees"; and 29 *Del.C.* § 5701(1), a statute somewhat like the one here under review, in which "employee" is defined as including officers of the State and any political subdivision thereof.

We must give credence, at least as instances of general usage, to these examples from our own statutes, and it, therefore, appears that, at the very least, Delaware's "general usage" of these terms is not clear and uniform. This statute needed a definition of its coverage, and the definition supplied includes officers who meet the stated criteria. And for a wide variety of treatments in other jurisdictions see 14 Words and Phrases, *Employee,* under the sub-caption "Public Officers," at 758–775. See also 30 C.J.S., *Employee,* at 672.

The State cites Judge, now Justice, McNeilly's opinion in *Wharton v. Everett,* Del.Super., 229 A.2d 492, 494 (1967), as supposedly holding that the expression "employees" excludes officers. That case, however, does not support the State's view because the statute before Judge McNeilly contained no definition of "employees," and he made clear that legislation could have clarified the meaning.

█ Still further indications that officers of the State, including plaintiffs, were meant to be swept into the category of employees for the purposes of this statute appear from the fact, which we shall later review in some depth, that the General Assembly subsequently attempted to remove from the statute's coverage "all elected and appointed officials." It is a respected canon of statutory construction that a legislature is presumed to mean what it says, so that if it alters a statute, it is

presumed to be making a change, rather than merely saying correctly what had been intended, but badly said, in the first place. The burden of establishing that no change was made in the law, as in overcoming other presumptions, rests upon the party contending that no change was intended by an amendment, and that none was made, whether intended or not. *Wilkerson v. Cropper,* Del.Super. *in banc,* 171 A. 191 (1933); *Kennedy v. Truss,* Del.Super., 13 A.2d 431 (1940); and *Daniel D. Rappa, Inc. v. Engelhardt,* Del.Supr., 256 A.2d 744, 746 (1969).

These considerations, taken separately and then together, make it clear than on July 1, 1975, a cost of living adjustment (C.O.L.A.) law was enacted which at that time gave the benefit of the potential increase to all who worked for the State[3] if they were within the parameters laid down in the statute.

We turn now to consider what, if any, was the thrust of the amendments above referred to, which were enacted on the 1st of July, 1976, and on the 3rd of August, 1976, respectively.

The first of these amendatory statutes is cited as House Bill No. 1274, as amended by House Amendment No. 1. It contains the following language:

"(d) Amend Chapter 65, Title 29, Section 6532(a), Delaware Code, by inserting immediately after the word 'State' and before the word 'shall' as the same appear in said section the following:

" ', except elected and appointed officials,' "

There is no hint in the statute that this amendment was intended otherwise than as a change in the law, which, as stated above, is what a court must presume in the absence of a clear indication to the contrary.

Also, if we insert the amendatory wording into Section 6532(a), we see yet another indication that the General Assembly in fact deemed the word "employees" to include officers, for that amendment adjusts

---

**3.** Except the sitting Governor, to whom we shall refer later.

the statute to read in pertinent part as follows:

> "All employees of the State, except elected and appointed officials, shall be paid a salary supplement . . ."

The language of this amendment clearly reinforces the conclusion that the Legislature understood officials to be employees.

Subsequently, on August 3rd, 1976, this amendment was revised to read in pertinent part as follows:

> "Section 1. Amend Section 6532(a), Title 29, Delaware Code, by striking the words 'except elected and appointed officials,' after the word 'State' and before the word 'shall' of said subsection and substituting in lieu thereof the following words:
>
> "', except elected officials, the judiciary, cabinet secretaries and members of boards and commissions,'".

This second amendment included the same revealing feature as the first amendment, for, again inserting the amendatory patch, the statute was thereby changed to read:

> "All employees of the State, except elected officials, the judiciary, cabinet secretaries and members of boards and commissions, shall be paid a salary supplement . . ."

Defendants point out as helpful to their side that the Attorney General, in an opinion dated March 29, 1976, asserted the view—which his office has sought to uphold in this litigation—that the term "employee" in the original Act was not meant to include "officers", but he recommended legislation to make the point clear. He also stated, following the case law,[4] that "officers" is a vague term, and he recommended legislation to clarify its scope.

There is ample authority that administrative rulings based on experience and specialized knowledge should be respected by the Courts. *See, e. g., Daniel D. Rappa v. Engelhardt, supra,* at 746; 2A Sutherland,

*Statutory Construction,* (4th ed.), § 4905. And in certain cases this rule has been applied to Attorney Generals' opinions, especially where those opinions have been published and have stood unchallenged for a substantial length of time, presumably being relied upon by the public in the meantime. 2A Sutherland, *Statutory Construction,* (4th ed.), § 49.05, at n.22; *Mitchell v. Register of Wills for Baltimore City,* 227 Md. 305, 176 A.2d 763, 766 (1962). In this instance, however, the critical knowledge is of the English language, a field in which the ten plaintiffs, their learned counsel, and we ourselves are also expected to be competent. Indeed, that is true of everyone in this case, on either side. In this particular instance, therefore, we feel that we are paying the maximum respect to the General Assembly by not weighting our view in favor of counsel for either side, confining ourselves to the wording which the legislature actually chose, and not embarking upon speculation as to what may or may not have been in the members' minds, but which, for whatever reason, they did not say.

Moreover, the few facts which are before us fail to support any claim that the amendment of July 1, 1976, was intended by the General Assembly as an act of deference to the Attorney General, seeking to follow his legal opinion. We have before us no indication that the members of the General Assembly were even aware of the Attorney General's opinion. And if they were aware that the Attorney General had said that "employees" probably did not include "officers", they certainly did not favor that reading, for they again chose language carrying a plain inference to the contrary—"All employees of the State, except elected and appointed officials, . . ."

And the second recommendation of the Attorney General—to specify the scope of the uncertain word "officers"—was ignored. The word "officials" in the expression "except elected and appointed offi-

---

4. See, e. g., *State ex rel. Biggs v. Corley,* Del. Super.Ct. *in banc,* 172 A.2d 415, 419.

cials" seems to us to be the equivalent of the word "officers".

Finally, there was no statutory language or accompanying synopsis even suggesting that the intent of the first amendment was to clarify anything. Only the synopsis of the second amendment said that, and it said it was clarifying the first amendment, not the original Act. Again, it seems to us that we respect the General Assembly most when we heed what it said, not trying to read minds to the contrary.

What is the legal effect of this attempted curtailment of compensation?

█ In the absence of some constitutional restraint, a state may add to or subtract from the compensation of its employees as it may from time to time see fit. The case of *Grant v. Nellius*, 377 A.2d 354, decided by this Court on July 27, 1977, deals somewhat with the provision in the federal constitution which forbids impairment of the obligation of contract, that case being concerned with non-officer employees only. The plaintiffs in this case, however, invoke Article XV, § 4, of our State constitution, which applies to public officers. It reads as follows:

"§ 4. *Extension of term of public officer; diminution of salary or emoluments.*

"Section 4. No law shall extend the term of any public officer or diminish his salary or emoluments after his election or appointment."

Such a provision has been enacted, not just in Delaware, but fairly widely, and many states go even further and have provisions in their constitutions similar to the one we have with respect to our Governor (Article III, § 7), forbidding either an upward or downward change in compensation during an incumbent's term of office. 63 Am.Jur.2d, *Public Officers and Employees* § 369, at 852; 67 C.J.S. *Officers* § 95, at 342.

Constitutional provisions such as ours are designed not merely to safeguard the officials concerned, but, more importantly, in doing so, to protect the public from having to deal with officials who might treat them unfairly out of the dread of such personal disfavor as could result in a salary cut or the loss of some cherished emolument, i. e., to preserve the independence of those officers. *Du Pont v. Green*, Del.Super., 195 A. 273, 275 (1937); 67 C.J.S. *Officers* § 95 at 344; 63 Am.Jur.2d, *Public Officers and Employees* § 370, at 853.

Incidentally, it is immaterial in this connection whether the cut which such an official might fear would be of the salary or emoluments applicable at the commencement of his term or provided later. The potential duress would be the same in either case. *Booth v. United States*, 291 U.S. 339, 54 S.Ct. 379, 78 L.Ed. 836 (1934); 48 C.J.S. *Judges* § 36, at 997. The State concedes the point, and properly so, in view of the unanimity of the authorities.

█ This constitutional restraint has been held in Delaware, as elsewhere, to be "inexorable," to admit of no exceptions and offer no opportunity for evasion. *Barr v. Blackstone*, Del.Super., 13 A.2d 449 (1940). It was framed and adopted in 1897 by representatives of the people of this State, and nothing short of a constitutional amendment can override it.

█ It was urged that it would be possible for the General Assembly to add to a salary an "extra" of some sort, perhaps called an "adjustment," and then later take it away, without running afoul of this constitutional barrier. The immediate purpose underlying our constitutional provision, i. e., shielding an officer from duress, would apply as well to a threat of removing a salary adjustment as the salary itself. We see no importance to the name by which a salary increment might be called, for if it were not an outright increase in the salary, it would be at least an "emolument." "Emoluments" have been broadly defined in this State as "the profit arising from office or employment; that which is received as compensation for services, or which is annexed to the possession of office as salary, fees and perquisites; advantage; gain, public or private." *Barr v. Blackstone, supra*, 113 A.2d at 451. This is in harmony with the law elsewhere. 67 C.J.S. *Officers* § 95, at

350. Thus, such emoluments, once conferred, cannot be taken away from a public officer of this State prior to the expiration of his term.

■ The question thus now arises whether an increase of salary or emoluments by application of a standing formula is legally any different from a routine increase in salary—of which there have in the past been many—which merely calls for adding a specified number of dollars per pay period. It is argued that a formula supplement like the one in this case is a "future" promise which can be revoked with impunity, whereas a stated salary increase would be legally different. We fail to see the basis for such a distinction. All salary increases, which, once granted, must be paid until the end of the payee's term, as is the case with public officers of our State, are commitments for the future.

We find very little help in the few cases which are yet in the books dealing with the rising cost of living. See, e. g., *Matthews v. Allen*, 360 S.W.2d 135 (Ky.1962). But there is a species of formula which has been tested over several decades in several other states whose constitutions forbid increases as well as decreases, and it has generally been held that arithmetical applications of a pre-legislated formula, resulting in changes in the numbers of annual dollars, are not constitutionally forbidden, i. e., the salary is not altered in the eyes of the law, provided the formula itself remains unchanged.

In the case of *State of Ohio ex rel. Mack v. Guckenburger*, 139 Ohio St. 273, 39 N.E.2d 840, 845 (1942), 139 A.L.R. 728 (annotation on the point commencing at 737), the law of various states having clauses in their constitutions forbidding increases as well as decreases in pay was reviewed. Ohio thus joined the roster of states[5] whose highest courts had already adopted the rule that changes in compensation generated under a fixed formula are not increases or

decreases for purposes of constitutional restriction. Subsequently, other states followed those precedents, including Nebraska [*Hamilton v. Foster, et al.*, 155 Neb. 89, 50 N.W.2d 542 (1951)]; Montana [*Shubat v. Montana*, 157 Mont. 143, 484 P.2d 278 (1971)]; and Illinois [*Brissenden v. Howlett*, 30 Ill.2d 247, 195 N.E.2d 625 (1964)]. *Contra, Commonwealth ex rel. Woodring v. Walter*, 274 Pa. 553, 118 A. 510, 512 (1922); *State ex rel. Maltbie v. Will*, 54 Wash. 453, 103 P. 479 (1909); and *Guthrie v. Board of Comm'rs of Converse County*, 7 Wyo. 95, 50 P. 229 (1897). Doubtless there are other decisions agreeing with the majority, and it is noticeable that one of our leading legal encyclopedias mentions only the rule which we call the "majority" rule, without reference to the possibility of any other. 48 C.J.S. *Judges* § 36 at 997.

■ The application of this analogy to our case is clear. The view adopted by the overwhelming majority of states which have considered the question, and all we are aware of who have done so in the last half century, is that a formula in the eyes of the law is analogous to the conventional form of an increase in salary level. We so hold. The C.O.L.A. law, including its formula, was duly enacted in 1975; when it was enacted, it was applicable to many public officers, including judges, and the efforts in 1976 to take these increments away were forbidden by Article XV, § 4, of Delaware's constitution.[6]

What, then, is the legal status of a statute which has attempted, as our two 1976 amendatory statutes did, unconstitutionally to decrease the salary of a public officer? Are such statutes totally void and of no effect?

■ Before attempting to answer this question, we should also notice a second question of the same sort. The State has argued that the original enactment is void

---

5. In this enumeration Oklahoma appears to have been overlooked [*Drolte v. Board of County Comm'rs of Ellis County*, 176 Okl. 622, 56 P.2d 800 (1936)].

6. Since all these plaintiffs are constitutional officers, it is not necessary to consider the status of statutory officers, as was done in *State ex rel. Green v. Isaacs*, Del.Super., 171 A. 627, 630 (1934).

if it is read as plaintiffs read it, since this would cause the Governor's salary to be increased during his term, such increases being constitutionally forbidden by Article III, § 7. It is a fact that Governor Tribbitt's salary was within the sweep of the language used by the statute. Thus, the increase of the governor's salary, called for in 1975, and the decrease of plaintiffs' compensation, called for in 1976, both run afoul of constitutional prohibitions.

Our General Assembly has enacted a law, which appears as 1 *Del.C.* § 308, which aids us in respect to both instances. It reads thus:

"§ 308. *Severability of provisions.*

"If any provision of this Code or amendments hereto, or the application thereof to any person, thing or circumstances is held invalid, such invalidity shall not affect the provisions or application of this Code or such amendments that can be given effect without the invalid provisions or application, and to this end the provisions of this Code and such amendments are declared to be severable. (1 *Del.C.* 1953, § 308)."

The word "application" in this quotation is pertinent. Applying the C.O.L.A. statute to a governor in office at the time of enactment would be an unconstitutional "application," just as efforts to take away salary increments from sitting judges are. Therefore, the enactment of such laws as ours will not apply to the Governor or any judge then in office until expiration of their respective terms.[7] Incidentally, we have included the governor in this discussion, not because we think the Governor is within the reach of the lawsuit, but because the Governor's pay was used in an effort to establish that the 1975 statute is unconstitutional. It fails of that purpose.

And this aid to interpretation, 1 *Del.C.* § 308, supplied by the General Assembly, is confirmed by the treatment which the courts and legal scholars have given the same sort of problem, here and elsewhere. In *State ex rel. Green v. Isaacs, supra,* a part of an act was held unconstitutional because of Article XV, § 4, and a part was held constitutional. What was left after discarding the unconstitutional portions was, as in the case of our statute, capable of being given effect alone as an enforceable concept and therefore "severable," so the Court held the remainder of the statute constitutional. Numerous quotations from decisions in other states appear in that opinion, some of which explain the problem and its solution with considerable particularity. *Green* was followed in *State ex rel. Morford v. Emerson,* Del.Super., 10 A.2d 515 (1939), *aff'd* 14 A.2d 378 (1940). And see 2 Sutherland, *Statutory Construction* (4th Ed.), § 44.04, at 341–343; §§ 44.08, 44.09 and 44.18.

Still another argument used by the State is that, since the constitution necessarily applies to individual public officers during their terms of office (46 Am.Jur.2d, *Judges* § 67, at 139), rather than to any class or group of officers, plaintiffs' interpretation would produce an "anomalous" result. This refers to the fact that certain people now serving in public offices, including some judges other than plaintiffs, would not get the benefit of the C.O.L.A. law, while others, whose terms began before July 1, 1976, are still within the protection of the constitutional provision, including all these plaintiffs, and would receive those benefits. This doubtlessly does work an "anomaly." Yet this results from merely applying the constitutional and statutory law as written, and the removal of such an anomaly is not among the prerogatives of the judiciary. It is a problem for the lawmakers to consider, and, if they do not like the anomaly, to make whatever change they consider desirable, remembering always that reductions in the pay of public officers during their respective ongoing terms require an amendment to the constitution. 67 C.J.S. *Officers* § 95, at 345–346.

---

7. The date for determining which terms are ongoing would differ as between the Governor and the judges. For the Governor the determining date would be June 30, 1975, the date of enactment of the statute increasing compensation; and for the judges, July 1, 1976, the date of enactment of the first statute attempting curtailment.

For the courts to assume that the members of the legislature were unacquainted with the State's constitution and laws, and did not know the meaning of the words in the statutes they enacted, and then for the courts, under the guise óf interpretation, to do over those laws in order to achieve less awkward applications or what they consider a better public policy, would be for the courts simply to take over the prerogatives of the legislature. In our view, retaining the judiciary's proper and more limited role is of vital importance to our form of government.

Our conclusion, therefore, is that the judgment below must be reversed and the case remanded for further proceedings consistent with this opinion.

QUILLEN, Justice *Ad Litem,* dissenting:

I respectfully dissent from the opinion of the majority. I would be less than candid if I did not admit that the decision reached by the majority is technically defensible on a narrow view of the issues presented by the record in this case. But nonetheless I find the decision is wrong and therefore I am compelled to express with regret a contrary conclusion. In my judgment, the majority has reached for a result which is contrary to the better legal construction on the narrow issues presented and, perhaps more importantly, because of the broader issues of public policy necessarily involved in this case, contrary to reason and common sense.

The chief error of the majority is its purported yielding to the legislative will by the linking of a series of technical interpretations while choosing to ignore what actually happened. In so doing, the majority has done violence to legislative intent and has imposed upon the State and its citizens a long term fiscal commitment by judicial fiat. However well-deserved a raise in judicial salaries, and I certainly agree that it is, it should not be accomplished by this Court usurping the function of the General Assembly. That is precisely the effect of what the majority has done.

This action is brought by the eleven Judges who comprise the Superior Court of the State of Delaware. The defendants are sued in their official capacities as Secretary of the Department of Finance, State Budget Director and State Treasurer.

There are two basic questions. First, is a cost of living supplement law (sometimes called cost of living adjustment or C.O.L.A.) enacted by 60 *Del.Laws* ch. 187 (Senate Bill 395 as amended by Senate Amendment 3 in the 128th General Assembly, sometimes hereinafter Senate Bill 395) applicable to the plaintiffs? Second, if the law is applicable to the plaintiffs, do such benefits become "salary or emoluments" of the plaintiffs' office which could not thereafter be taken away during their terms? It is necessary to review the chronology in order to understand fully the two issues. I do so with assistance from the briefs in this Court and from the opinion below.

On September 30, 1974, Governor Tribbitt issued Executive Order Number Fifty-Five thereby creating a "Governor's Task Force on Cost-of-Living Pay Increase Formulas." The duties of said Task Force were: "to review all pay scales used in compensating state employees, recommend any required changes in such pay scales, analyze various cost-of-living formulas to determine the most feasible for use by the State, price the cost of the formula for the following three fiscal years, and draft legislation for implementation of the formula if adoption is recommended." Senate Bill 395 resulted from the efforts of this Task Force and was enacted into law as of June 30, 1975 as 60 *Del.L.* ch. 187. Section 1 thereof amended 29 *Del.C.* ch. 65 by adding a new § 6532 to read in part as follows:

§ 6532. *Cost of Living Salary Supplements*

"(a) All employees of the State shall be paid a salary supplement as a percentage of their base pay equivalent to the percentage change in the Consumer Price Index for the Philadelphia region . . .

"(c) For purposes of this section, an 'employee' is defined as one who works the regularly scheduled full-time hours of the employing agency or at least 30 or

more hours per week or 130 hours per month (with allowable interruptions) throughout the year and is compensated with a regular State pay check."

The section provided for a salary supplement calculated and, if appropriate, paid on a six month basis with a maximum of ten percent on an annual basis.

Subsequent to the enactment of 60 *Del. Laws* ch. 187, the Secretary of Finance, John E. Malarkey, asked for an opinion on whether the cost-of-living salary supplements authorized by 60 *Del.Laws* ch. 187 could be paid to full-time employees then receiving their statutorily authorized maximum salaries and to full-time employees whose titles are designed as line items in § 10, 60 *Del.Laws* ch. 113, the fiscal 1976 budget bill. The Attorney General, by letter dated March 29, 1976, in a qualification to his general response, concluded that public officers, as distinct from employees, were not entitled to the benefits of chapter 187. This conclusion necessarily raised a corollary question: Who were public officers? The Attorney General said in part the following:

"Based on the foregoing criteria, it is the opinion of this Office that the several cabinet secretaries, *the judiciary,* and members of the State's various boards and commissions clearly qualify as public officers. Therefore, they are not entitled to the benefits of Chapter 187.

The determination of which additional positions or individuals may qualify as public officers involves delicate questions of fact and construction which we decline to consider in the abstract and which are more properly left to administrative judgment. Accordingly, although a reasonable case can be made for classifying division directors of the State's several executive departments and, perhaps, others in the class of public officers, we decline to recommend such action at this time. Rather, we recommend that the Council seek remedial legislation to clarify the meaning and intent of the Chap-

ter. This approach will not only afford the Council an opportunity to review with the General Assembly the various administrative problems associated with the existing statutory language, *but will also ensure that our conclusion that the General Assembly intended to exclude public officers from receipt of salary supplements under Chapter 187 will be reviewed promptly.*" (Emphasis added.)

Shortly thereafter, as part of House Bill 1274, as amended by House Amendment 1 in the 128th General Assembly, the fiscal 1977 budget bill at Section 53(a) and (d) thereof, the following amendments to this new § 6532 were adopted:

"(a) Amend Chapter 65, Title 29, Section 6532(a), Delaware Code, by striking said subsection (c) in its entirety.

\* \* \* \* \* \*

"(d) Amend Chapter 65, Title 29, Section 6532(a), Delaware Code, by inserting immediately after the word 'State' and before the word 'shall' as the same appear in said section the following:

" ', except elected and appointed officials,' "

60 *Del.L.* ch. 511 signed by Governor Tribbitt on July 1, 1976, having been introduced on June 28, 1976.[1]

While there is inconsistent terminology employed in Section 53(a) of House Bill 1274, it seems that its obvious purpose was to strike in its entirety the definition of the term "employee" as originally contained in § 6532(c) and, by adding the new qualifying language to § 6532(a), to make it clear that all State employees, expressly excluding elected and appointed officials, were entitled to the cost-of-living benefits provided by § 6532(a) regardless of the hours worked. Thus, the precise employee-officer distinction noted by the Attorney General was in effect confirmed.

Still later, by House Bill 1306 in the 128th General Assembly, a further amendment was made to § 6532 as follows:

1. Although the parties stipulated that the legislative debate of H.B. 1274 could be admitted

into evidence without formal proof, it does not appear as part of the record.

"Section 1. Amend Section 6532(a), Title 29, Delaware Code by striking the words ', except elected and appointed officials,' after the word 'State' and before the word 'shall' of said subsection and substituting in lieu thereof the following words:

', except elected officials, the judiciary, cabinet secretaries and members of boards and commissions,'.

"Section 2. Amend Section 6532, Title 29, Delaware Code by adding a new subsection which shall read as follows:

"(c) For purposes of this section, an 'employee' is defined as one who is compensated with a regular State pay check.

"Section 3. The effective date of this Act is July 1, 1976."

60 *Del.L.* ch. 690 signed by Governor Tribbitt on August 3, 1976, having been introduced on July 22, 1976.

The legislative synopsis appearing at the bottom of House Bill 1306 provides the following notation as to its purpose:

"This Bill clarifies the intent of House Bill No. 1274 as amended and enacted for the exclusion of the above-stated positions from receipt of cost-of-living salary adjustments and provides for the definition of an 'employee' previously deleted in the statutes."

The application of the C.O.L.A. formula resulted in salary supplements in each of the two applicable six-month periods after its enactment until April 1, 1977. 29 *Del.C.* § 6532(a). No adjustment, however, was made in the pay of these plaintiffs, and, due to administrative determination, they have received no benefit to date from the Act.

The operation of 29 *Del.C.* § 6532(a) was suspended by a further Act of the General Assembly, House Bill 172 of the 129th General Assembly, which rescinded the cost of living salary supplement scheduled to take effect on April 1, 1977. Finally, as to the

pertinent legislative history, effective July 1, 1977, C.O.L.A. was abolished by the general repeal of 29 *Del.C.* § 6532(a) which was enacted as part of House Bill 300 as amended by House Amendment 27 and Senate Amendment 1, the fiscal 1978 budget bill. 61 *Del.Laws* ch. 116, § 86(b), passed over Governor du Pont's veto on July 6, 1977.

In the midst of this legislative activity, the plaintiffs on September 15, 1976 filed suit in the Court of Chancery. On July 22, 1977, Vice Chancellor Brown decided "that the purpose of the definition contained in subsection (c) of 29 *Del.C.* § 6532 as originally enacted was to limit and qualify which employees of the State would be entitled to the cost-of-living pay supplements authorized by subsection (a) and that it was not intended to expand the term 'employees' as used in subsection (a) to include public officers and members of the State Judiciary." *Stiftel v. Malarkey,* Del. Ch., 378 A.2d 133, 138–139 (1977).[2]

The plaintiffs have appealed to this Court from the decision of the Vice Chancellor. It should be noted that the full thrust of the plaintiffs' appeal is not simply that they are entitled to the two C.O.L.A. supplements which were in fact paid to employees included within the terms of Senate Bill 395 for the first two six-month periods. They also contend that, since they are public officers and not merely employees, the enactment of the C.O.L.A. formula creates "salary or emoluments" under Article XV, § 4 of the Constitution of the State of Delaware which cannot thereafter be diminished during any existing term of any plaintiff. *Carper v. Stiftel,* Del.Supr., 384 A.2d 2 (1977).[3] Thus, the plaintiffs contend that they are unaffected by the two amendments expressly excluding them and by the suspension and repeal of the C.O.L.A. statute. They claim they are entitled to the benefit of its provisions for future six-month periods of varying numbers depend-

2. The Vice Chancellor declined to disqualify himself for appropriate reasons. See *Stiftel v. Malarkey, supra,* at 378 A.2d 134, ftnt. 1. It should also be noted that the Vice Chancellor's decision was against his own self-interest.

3. The Constitutional provision reads: "No law shall extend the term of any public officer or diminish his salary or emoluments after his election or appointment."

ing on the length of the remaining portion of the existing term of each plaintiff.[4]

While the case is not without its difficulty, I do not find that it is necessary to go beyond the threshold issue to reach a determination. For the reasons given by the Vice Chancellor and some additional reasons, I conclude that the plaintiffs are not within the definition of "employee" included in the original Senate Bill 395.

Plaintiffs urge that the terms of Senate Bill No. 395 are clear and unambiguous and that they are included within the statutory definition contained in subsection (c).[5] The State also contends that the terms of Senate Bill No. 395 are clear and unambiguous but that plaintiffs are not included within the statutory definition contained in subsection (c). The State's rationale is that judges are excluded from these benefits because they are "officers", not "employees."

I fail to be convinced by either side that 29 *Del.C.* § 6532, subsection (c), as originally enacted, is clear and unambiguous on its face.

> "(c) For purposes of this section, an 'employee' is defined as *one* who works the regularly scheduled full-time hours . . . ." (Emphasis added.)

The term "one," contained therein is an indefinite pronoun and strikes me as causing an inherently ambiguous definition on its face in the context of the original act.

Confirmation of this surface reaction is readily obtained by dictionary reference. *Webster's Third New International Dictionary* (1971) at page 1575 gives two primary definitions of the pronoun "one": (1) "a certain indefinitely indicated person or thing usually of a kind or under consideration", citing the following example of usage: "had several current novels and let her borrow one"; or (2) "an individual of a vaguely indicated group: anyone at all:

anyone in a general way", citing this illustration of usage: "one wouldn't like to see that happen". In effect, the defendants and the Court below find that the word "one" in the original statutory definition at issue related to the kind of thing under consideration while the plaintiffs find it relates to anyone at all. Each definitional path is feasible. Moreover, the path chosen also can lead to conflicting results on the meaning of the statutory term itself, "employee". The General Assembly has not expressed a preference of usage, nor is its intent ascertainable from the face of the statute. I therefore conclude that 29 *Del.C.* § 6532, Section 1, subsection (c) is unclear and ambiguous.

It is an accepted principle of statutory construction that, if the legislature does define the coverage of a statute by providing a definitional section, a court will be bound by that definition. *Fox v. Standard Oil Company of New Jersey*, 294 U.S. 87, 55 S.Ct. 333, 79 L.Ed. 780 (1935); 1A Sutherland, *Statutory Construction* (4th ed.) § 20.-08. However, if that statutory definition is *unclear* or *uncertain*, then the court must construe that definition. *Id.* at § 27.02. See also 82 C.J.S. *Statutes* § 315, p. 538; *State for Use of Altorfer Bros. Co. v. Dalrymple*, 227 Minn. 533, 35 N.W.2d 714 (1949); *Bonanno v. Bollo*, 72 R.I. 278, 50 A.2d 621 (1946).

Having determined that 29 *Del.C.* § 6532 section 1, subsection (c) is unclear, it falls upon this Court to determine what the General Assembly intended by this definitional section. 82 C.J.S. *Statutes* § 322b(3), p. 588. The Court may resort to extrinsic facts or competent evidence which shows the meaning of the statute. 82 C.J.S. *Statutes* § 351, p. 736; *Delaware Steeplechase and Racing Ass'n. v. Wise*, Del.Supr., 27 A.2d 357 (1942). The Court may also look to a

---

4. The most advanced term among the plaintiffs will expire on March 10, 1978; the most recent term will expire on October 25, 1986. The anomaly of plaintiffs' position, employees for C.O.L.A.—officers for "salary or emoluments", is based on the statutory definition of "employee" in the C.O.L.A. statute.

5. A stipulation establishes that plaintiffs satisfy the stated work minimums, are paid by regular state pay checks and are not getting the supplements *to which plaintiffs feel entitled*, through the application of the formula.

statute within the context of the overall pre-existing statutory scheme. *Council 81, American Federation of State, County and Municipal Employees, AFL–CIO v. State,* Del.Supr., 293 A.2d 567 (1972).

It seems to me that, in the area of benefits for those who work for the State, where there is an existing statutory and administrative structure of considerable mass, it is necessary to put on blinders to interpret the word "one" as the plaintiffs suggest. I think the statutory pronoun obviously relates to the category under consideration, employees, and the definitional section was designed primarily to eliminate certain parttime employees and not designed to remake the wheel by inserting a new statutory classification into a salary supplement for employees already on the payroll. Thus, I find that pronoun "one" refers back to "employee". In effect, insofar as the word "employee" is concerned, the Court is close to the position of viewing 29 *Del.C.* § 6532 in Senate Bill 395 in the same light as a statute without a definitional section.

There are several factors which lead me to conclude that the statutory term "employee" does not include the plaintiffs, members of the Judiciary.

First, as the Court below found, while the distinction is not always clear, Delaware judicial opinions have recognized the existence of a legal distinction between public officers and public employees despite the fact that both officers and employees work for and are compensated by the State. *State ex rel. Biggs v. Corley,* Del.Ct. in Banc, 172 A. 415 (1934); *Martin v. Trivitts,* Del.Super., 103 A.2d 779 (1954); *State ex rel. Green v. Glenn,* Del.Super., 4 A.2d 366 (1939); *Wharton v. Everett,* Del.Super., 229 A.2d 492 (1967), aff'd on other grounds, Del.Supr., 238 A.2d 839 (1968). This general distinction suggests strongly that the plaintiffs are officers and not employees. Therefore, when the General Assembly uses the word "employee" in a statute it should not be interpreted as including public officers unless it is clearly so expressed. *Whar-*

*ton v. Everett,* supra, 229 A.2d at 494. See also *State v. Campbell,* Del.Gen.Sess., 22 A.2d 390 (1941); *Hollett v. Wilmington Trust Co.,* Del.Super., 172 A. 763 (1934). As noted by the Vice Chancellor, the very statute which directs salary payments draws the distinction between "state officials and employees". 29 *Del.C.* § 2711; *Stiftel v. Malarkey, supra,* 378 A.2d at 139, ftnt.3.

Second, as the Court below noted, the Delaware judicial decisions in this regard are reflective of general common law in this definitional area. 63 Am.Jr.2d, *Public Officers and Employees,* § 11. Where a statute uses words which have a commonly accepted meaning at common law, absent a showing to the contrary, it is presumed the word is used in the sense which it is understood at common law. 1 *Del.C.* § 303; *State v. Campbell, supra; Hollett v. Wilmington Trust Co., supra.*

Third, in the particular original statutory definition, as noted by the Vice Chancellor, the definition qualifies and limits which employees of the State are entitled to the cost of living benefits. These words of hourly and paycheck limitation should not be read to expand by implication the generally accepted common law meaning of "employees" to include officers.

Fourth, in this case where the statute extends new benefits for the first time, it seems to me that any ambiguity should be conservatively resolved in order to assure that the class benefited remains within the possible limits of the class intended to be benefited. In short, a conservative construction guarantees that no one will be benefited beyond the intent of the General Assembly; a liberal construction does not. The subsequent action of the General Assembly confirms the wisdom of a conservative approach here.

Fifth, we are not writing on a blank slate in this case. There is a long history of judicial salary increases under the Constitution of 1897. That history demonstrates that judicial salaries have been considered as part of the law dealing particularly with

salaries of public officers [6] and judicial pay increases have been enacted, especially in recent years, entirely separately.[7] Even with the advent of the merit system, the General Assembly has jealously maintained its independent legislative treatment of judicial salaries.[8] It should also be noted in this regard that the General Assembly has established a separate judicial pension plan, favorable to judicial office in comparison to other officers and employees, which has independent legal significance under our State Constitution. 29 *Del.C.* ch. 65; *Carper v. Stiftel, supra.*

Sixth, it is interesting to compare an earlier general salary adjustment. 38 *Del. Laws* ch. 33, § 2 (1933). Due to the economic problems created by the depression, the General Assembly enacted a general salary reduction. It expressly affected "the annual salary of every officer and employee" of the State. But it was made "effective only if not in conflict with Section 4, Article XV of the Constitution of the State of Delaware" and particularly excepted the Judiciary. The General Assembly in 1933 thus recognized that using the term "employee" would not have included the Judiciary.

Seventh, while the issue before us comes to us in relative isolation, this Court should be mindful that it is dealing with a complex area of public administration on which the Attorney General has promptly spoken. Indeed, this Court has recognized by its own abstention that the area of benefits to those who work for the State is a complex area of administrative law. *Dorsey v. State ex rel. Mulrine*, Del.Supr., 283 A.2d 834 (1971); *In re State Employees' Pension Plan*, Del. Supr., 364 A.2d 1228 (1976); *Grant v. Nellius*, Del.Supr., 377 A.2d 354 (1977); *Carper v. Stiftel*, Del.Supr., 384 A.2d 2 (1977). Since we are in an area where questions of construction are frequent and interrelated,

it is important to give significant weight to a contemporaneous administrative interpretation. See 2A Sutherland, *Statutory Construction* (4th ed.) § 49.03 and § 49.08; *State ex rel. Zebley v. Mayor and Council of Wilmington*, Del.Super., 163 A.2d 258 (1960); *Nationwide Mutual Insurance Co. v. Krongold*, Del.Super., 318 A.2d 606 (1974).

Eighth, in addition to the interpretation of the Attorney General on behalf of the executive branch of government, the General Assembly responded to the Attorney General's suggestion for clarification. By two amendments to the Delaware Code, the General Assembly made it clear that judges were not intended to be included in the C.O.L.A. statute. 60 *Del.Laws* ch. 511 and ch. 722. Plaintiffs point to a cannon of statutory construction that the General Assembly is presumed to mean what it says, so that if it alters a statute, it is presumed to be making a change in it, rather than merely clarifying what was meant in the first place. But it is no answer to these enactments to say that they were changes and not clarification of the original statute. An equally respected principle of construction is that a presumption of a change in rights is merely a presumption which may be rebutted. 1A Sutherland, *Statutory Construction*, (4th ed.) § 22.30 at page 179 reads as follows:

> Although a presumption of change in legal rights is probably reasonable in that amendment is more frequently used to add or take a provision from a law that to interpret it, the fact of amendment by itself does not indicate whether the change is of substance or form—whether a right is added to or taken from the original act, or whether a provision in the original act is merely being interpreted,

---

6. See 1935 *Rev.Code* § 369 and 1915 *Rev.Code* § 395.

7. The following acts since 1953 have raised judicial salaries and affected the Superior Court: 59 *Del.L.* ch. 472 (1974) from $31,000 to $39,000 in two steps; 57 *Del.L.* ch. 675 (1970) to $31,000; 55 *Del.L.* ch. 403 (1966) to $23,500; 52 *Del.L.* ch. 113 (1959) to $20,000.

8. As footnote 6 suggests, the General Assembly has been both active and responsive to needs in the judicial salary area. This is not to say that the time is not ripe for reconsideration. Consider the $54,500 paid Federal District Judges for life. Indeed, the chronology alone suggests the time for a pay raise is now ripe.

that is, made more detailed and specific. To determine this the circumstances surrounding the enactment must be looked into. If they indicate the legislature intended to interpret the original act *the presumption is rebutted.* An amendment of an unambiguous statute indicates a purpose to change the law, whereas no such purpose is indicated by the mere fact of an amendment of an ambiguous provision. (Emphasis added.)

See also *Kennedy v. Truss,* Del.Super., 13 A.2d 431 (1940). The first amendment to 29 *Del.C.* § 6532 was made effective as of July 1, 1976, approximately three months after the opinion of the Attorney General was issued. The opinion was directed to Secretary Malarkey, the Secretary of Finance and Executive Secretary of the Advisory Council on State Salary Administration, and the first amendment was part of the fiscal 1977 budget bill. There is no basis for concluding that the legislative draftsmen were not aware of this opinion when the amendments were made. It is also probable that, if the draftsmen did not agree with the Attorney General's interpretation, they would have amended § 6532 accordingly. Instead it appears that the General Assembly, triggered by the Attorney General, was merely interpreting the original provision by using more precise language. See 2A Sutherland, *Statutory Construction* (4th ed.) §§ 49.08, 49.09 and 49.10. It is of course possible to quibble about the form of both 1976 amendments but it is not substantively proper to interpret them to evidence an intent that the Judiciary was ever intended to be benefited. I attach no particular significance to the fact that the correction was achieved by exception rather than definition. The entire context of § 6532 must be examined at each stage in the legislative history and the subsections at each stage should be read together. The point is that, faced with an interpretation that officers were excluded, the General Assembly expressly confirmed the exclusion.[9]

Ninth, while there is little factual determination involved in this case, this Court should also be mindful that there was a trial in the Court below. Insofar as the plaintiffs and the majority opinion rely on the testimony of the Budget Director and the computations he made for funding purposes, it should be noted that the Vice Chancellor found the significance of his computations on the issue before this Court to lack "persuasive value". *Stiftel v. Malarkey,* supra, at 378 A.2d 138. That determination is clearly correct. The Budget Director was given no guidelines and included the General Assembly members, who all agree were not intended to be included, and the Governor, who clearly cannot be Constitutionally included. Article III, § 7. It is also perhaps not insignificant that the opinion below added a view within the judicial branch in support of those previously expressed by the executive and legislative branches.

To my mind, the above factors lead to the conclusion that the plaintiffs were not included under the C.O.L.A. statute as originally enacted. But there are two other factors upon which plaintiffs rely which deserve special mention. First, plaintiffs say that the term "employee" is frequently used in our law to include public officers and consequently the distinction should not be drawn here. Second, plaintiffs argue that the legislative history demonstrates they were intended to be included within Senate Bill 395.

As to the first, it is true that for certain purposes the term "employee" is used in a context which includes public officers. Sometimes this inclusion is by necessity, e. g., 29 *Del.C.* § 6340(a) where public officers are included to enable the Budget Director to make up a complete State budget; sometimes the inclusion is to accomplish a particular objective, e. g., 50 *Del.L.* ch. 51 § 6 where Family Court Judges were formerly

---

**9.** Similarly, the reference in Section 2 of Senate Bill 395, to the "pay plan for employees of the Judicial Branch other than the State Judiciary" does not relate to the officer-employee context

but to the context of the fiscal 1976 budget bill, 60 *Del.L.* ch. 113, where the salaries of the Judiciary as well as employees are listed in "JUDICIAL" portion of the statute.

described as State employees to pinpoint the level of government responsible for their services. In short, this factor does no more than highlight the ambiguity that I have noted in Senate Bill 395. Statutes which expressly include public officers within the definition of employees for particular limited purposes are not controlling here.[10]

As to the second factor, plaintiffs cite from the legislative proceedings on the floor of the Senate place and rely particularly on the following exchange between Senator Berndt and Secretary Malarkey:

Berndt: Thank you Mr. President. You might have just answered my question in your remarks to Senator Hale. By these exempt employees, are we talking about secretaries, agency heads like the director of, like you.

Malarkey: Myself, sir.

Berndt: Like you.

Malarkey: I am an exempt employee, yes sir.

Berndt: This does nothing for secretaries and division heads and agency heads then?

Malarkey: The only thing, it allows, Senator, two things. One they will get whatever increase in the '76 budget, if one was granted. And two, they will get the cost-of-living supplement if there was one which starts April 1st sir.

I will assume that the exchange means what the plaintiffs assert and demonstrates Malarkey's opinion that Cabinet Secretaries were an illustration of exempt employees, a category which was to be covered by the C.O.L.A. statute. But the issue here is not the exempt employee versus the non-exempt employee. The issue here is officer versus employee. The officer-employee distinction and the exempt-non-exempt distinction are not synonymous. 29 *Del.C.* § 5903. It is true that, given the conclusion reached by me, Secretary Malarkey was mistaken as to his own coverage under the statute. But it was Secretary Malarkey himself who requested the Attorney General's opinion which necessarily dealt with his own coverage. Thus, it did not take a judicial opinion to alert Secretary Malarkey to the questions of vagueness raised under the statute.

There is, in the legislative record on Senate Bill 395, nothing expressly included or necessarily implied to indicate that the General Assembly ever focused at all on the question of judicial salaries, a question which historically has been a matter of careful legislative scrutiny. Moreover, there is absolutely nothing to indicate that the General Assembly intended to change any law which would have Constitutional implications under the "salary or emoluments" clause.

It is ironic that the majority relies on the testimony of Secretary Malarkey to determine that officers were intended to be included within the C.O.L.A. law and concludes that the supplement was analogous to a conventional salary increase subject to the Constitutional prohibition against diminishment. Thus, they say, if the C.O.L.A. law was intended to apply to officers whose salaries were Constitutionally protected, its benefits as to such officers could not be terminated. This clearly was not the understanding of the General Assembly, for Secretary Malarkey himself stated on at least *five* occasions during legislative debate that the salary supplements were not automatic and that, if the General Assembly did not appropriate funding each year, there would be no benefits conferred. Note the following exchanges from the plaintiffs' appendix.

At A–25, 26:

Malarkey: Well, of course, I'm not sure about the State revenue portion, Mr. Riddings, but the money must be appropriated each and every year by the General Assembly. It's not an automatic . . . . .

Riddings: It must be appropriated every year?

---

**10.** For example 29 *Del.C.* § 5701 dealing with social security and 29 *Del.C.* § 5853 dealing with conduct of officers and employees.

Malarkey: Yes, sir.

At A–32:

Malarkey: The fact of the matter is, the money must be appropriated to pay this every year, Mrs. Smith.

Smith: Well, suppose we have no money to appropriate a 10 percent cost-of-living increase?

Malarkey: Well, in the wisdom of the General Assembly, you know, if they don't appropriate, we can't expend it.

Smith: Very interesting.

At A–38–39:

Derrickson: Mr. Malarkey and if I may go over one point, this one more time and I know it's late and I know you are as tired as we are. On this point of the activation of this thing each year, where the choice of the legislature is either to fund it or not to fund it. It seems to me that that's rather unfair to a legislature in the future to command by law an increase and then to turn around and give them the option of reneging on that promise because this is what this amounts to is a promise of a percentile pay increase across the board for a set of state employees. It was my understanding that when the committee dealt with this, I'll talk to at some length with Representative Sincock about this. It was my understanding when the committee dealt with this, that they were going to build into this bill an escape mechanism and as I understand what you say, the only escape mechanism that there is, is just that the legislature is going to have to renege and not fund any particular increase. Is that correct?

Malarkey: That is it Mr. Derrickson. As you know, you must appropriate every year.

At A–80–81:

Malarkey: I think, Senator [Castle], and I'm just maybe into philosophy a little bit and I'd like you to know that. I believe when you say abdicate your responsibilities; I think you're only doing it for a year or so because every year when you pass a budget, if there's no money, it can't be funded.

At A–95–96:

Holloway: Mr. Malarkey, just want to be clear on a couple of points. Pass this legislation, even though the fiscal note makes projection for a couple of years beyond, if conditions in the State as such, that we cannot meet those other projections, everyone's not clear that there's no written mandate on the part of the General Assembly . . .

Malarkey: Senator Holloway, I think in my answer to that would be similar to the one I gave to Senator Castle a little while ago, sir. The General Assembly, once even after this passes and becomes a part of the Code, the bill has to be funded each and every year, sir.

Holloway: Well, what I'm saying sir, you're saying it must be funded each year. But if the money isn't there

. . .

Malarkey: If you don't put it in the budget sir, we can't pay it.

I suspect the members of the 128th General Assembly are going to be somewhat surprised by this Court's conclusion as to their intent given the assurances made to them. Certainly, the General Assembly believed that if for any reason they did not wish to appropriate funds, C.O.L.A. would cease. However, under the majority opinion expressed today, the General Assembly is Constitutionally required to fund the formula.

The General Assembly also understood that there could be a cut in salaries if the Consumer Price Index was a negative number. See Plaintiffs' Appendix pages A–31, A–68, A–76, A–77. The failure to consider this understanding in relation to the Constitutional provision is just another indication that officers were not intended to be included.

In summary, as to construction question, historically in Delaware as well as elsewhere, the term "employee" has a separate meaning from "officer". It is possible in a given context for the word "employee" to include the word "officer" if the General Assembly manifests such an intent. But, in this context, given a long history of careful

legislative scrutiny and given the vagueness which surrounds the statutory definition, I agree with the Attorney General and the Court below that, absent a clear statement or a clear indication to the contrary, the Court in this case should not on its own, as a matter of statutory construction, imply that the term "employee" includes the term "officer". The bare fact that "one" was used in the definitional section of subsection (c) of Senate Bill 395 is too thin a reed upon which to base a fundamental change in the General Assembly's time-honored approach to judicial salaries.

While the above interpretation is perhaps sufficient to state my view of the case, I am uncustomarily left concerned with its insufficiency. My anxiety about what the Court had done would not exist if this case merely presented a difference on a typical question of statutory construction. But, it seems to me, if there was ever a failure to see the forest for the trees, it is in taking a narrow technical approach to the issues presented here. There are at least two overriding considerations which strongly dictate against the decision of the majority.

First, any fair concept of separate and independent powers of the three branches of government must give full recognition to the power of the legislative branch, the branch that the Constitution of 1897 describes first. It particularly ill behoves the Judiciary, which constantly and properly asserts its own Constitutional authority, to fail to recognize the Constitutional limitations expressed and the Constitutional restraints implied on judicial authority. Nowhere is legislative power clearer than in General Assembly's traditional power to control the purse. Here the same General Assembly which passed Senate Bill 395 has said twice that the judges were to be excluded. That clearcut legislative expression should overwhelmingly override judicial construction of an ambiguous definition under the guise of yielding to legislative will. It should be noted that in its own sphere of influence the Judiciary sometimes finds it desirable to clarify judicial opinions after their issuance. See, for example, *Singer v. Magnavox Co.*, Del.Supr., 380 A.2d 969

(1977). That discretionary freedom, reasonably exercised, is certainly preferable to the "card laid is a card played" mandate that the majority here imposes on the General Assembly. Thus, in my judgment, one unfortunate result of majority opinion here is a failure to maintain a healthy respect for the Constitutional role of the General Assembly.

Second, there is an ancient quotation: "Let us consider the reason of the case. For nothing is law that is not reason."

Sir John Powell in *Coggs v. Bernard,* 2 Lord Raymond 909, 911 (1703); 92 Eng. Reprint 107; see also Coke, *Institutes* : Commentary upon Littleton, First Institute, § 138. Reason requires that we look at precisely what the Court has done.

We should focus on the dimension of the potential judicial expansion here. Assuming without deciding that the statute provides for compounding, if there was in fact an inflation rate of over ten percent a year and the maximum C.O.L.A. benefits attached, a $39,000 salary would compound annually to $62,809.89 in just five years, and to $101,155.96 in ten years. Given that kind of potential commitment, including a corresponding commitment under the pension law, reason requires that it should be made directly and openly with the General Assembly having a fair chance to appreciate what it is doing. The nature of the issue demands that the issue be put forthrightly before the General Assembly.

Moreover, the decision leaves the legislatively contemplated structure of judicial salaries in complete disarray. C.O.L.A. benefits, even without the statutes enacted after Senate Bill 395, are dependent on the time of appointment, thus disrupting the entire salary structure of the Judiciary. A trial court judge with several years of C.O.L.A. benefits could have a salary far in excess of a Supreme Court Justice. A Vice Chancellor serving midterm with C.O.L.A. benefits might have to take a salary cut to start a fresh term as Chancellor or Supreme Court Justice. These results are proper considerations which the Court here cavali-

erly dismisses. As this Court said in *E. I. du Pont de Nemours & Co. v. Clark,* Del. Supr., 88 A.2d 436, 438 (1952):

"In determining the meaning of ambiguous statutory language, an appreciation of the results which may follow from one possible construction or another may, on occasion, be conclusive as to the correct construction to be placed upon the language, since an irrational, impractical or excessive result presumably could not have been intended by the Legislature."

If the complete legislative history is considered, the result is even more irrational. The same judge in accepting a new term to the same office takes a pay cut. Chancellor Marvel, the most senior judge in the State in terms of service, does not get the C.O.L.A. benefit since his elevation to the Office of Chancellor came after July 1, 1976 and he will receive less pay than any Superior Court Judge and less pay than one Vice Chancellor. A judge with a term predating July 1, 1976 may not accept a judicial promotion to a higher office carrying a nominally higher salary because his salary would actually be cut severely due to the loss of the C.O.L.A. benefits. There are innumerable other consequences of the majority decision as to all officers who held office during the period the statute was in effect. The record does not disclose and I do not know the consequences of the majority decision and there is nothing to indicate that the majority knows those consequences. To characterize these results as "anomalous" seems to me to be a gross understatement. Such results are beyond the bounds of reason. Statutes should not be construed to require unreasonable, absurd or unworkable results. *E. I. du Pont de Nemours & Co. v. Clark, supra,* 88 A.2d at 438.

Finally, in terms of reason, we are dealing with salaries paid by the public and the public has right to understand what is done with its money. It is not just the General Assembly that is losing control over the purse, it is the public as well. The decision here should make common sense to the public. Law is good sense and what is contrary to good sense is not good law. *Burke v. State,* N.Y.Ct. of Claims, 64 Misc. 558, 119 N.Y.S. 1089, 1099 (1909). Obviously, there are difficult issues for public understanding but the pay of public officials should not be one of them. Although somewhat difficult, I think the public will understand the pension case decided today [*Carper v. Stiftel,* Del.Supr., 384 A.2d 2 (1977)] because it will understand that the State, as others, should keep its bargain made in an open covenant openly achieved. But I doubt if there will be public understanding on the expansive judicial construction here given the C.O.L.A. statute and the State Constitution. Any lack of public understanding will, in my judgment, be reasonable.

Since I find that plaintiffs were never included within the C.O.L.A. law, I need not determine and do not determine whether such benefits are "salary or emoluments" under Article XV, § 4 of the State Constitution. The State's brief concedes such coverage would be Constitutionally protected. I note, however, that I am not necessarily convinced that ending for future years the formula cost-of-living salary supplement under consideration here would constitute a diminishment of salary. Compare *Grant v. Nellius, supra.*

I would affirm the decision of the learned Vice Chancellor.